109-08/PJG
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BC 1651)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TROJAN MARITIME INC.,

                              Plaintiff,

          -against-

RICH WEALTH SHIPPING SERVICES CO.,
LTD. a/k/a RICH WEALTH SHIPPING
SERVICES CO., LIMITED, and TA YI
INTERNATIONAL CO., LTD. a/k/a TA YI
INTERNATIONAL CO., LTD. (SAMOA),

                              Defendants.
------------------------------------------------------------x

08 Civ. 1863 (HB)


**AMENDED**
**VERIFIED COMPLAINT**


          Plaintiff TROJAN MARITIME INC. (hereinafter "TROJAN"), for its Amended Verified

Complaint against Defendants RICH WEALTH SHIPPING SERVICES CO. LTD. a/k/a RICH

WEALTH SHIPPING SERVICES CO., LIMITED (hereinafter "RICH WEALTH") and TA YI

INTERNATIONAL CO., LTD. a/k/a TA YI INTERNATIONAL CO., LTD. (SAMOA)

(hereinafter "TA YI") alleges upon information and belief as follows:

          1.          This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party.  This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff TROJAN was and still is a business entity duly organized and existing under the laws of a foreign country with an address in care of Independence Maritime Agency, Inc., 39 Broadway, Suite 2140, New York, NY 10006.

3.    At all times relevant hereto, Defendant RICH WEALTH was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address in care of Fairway Ship Chartering, P.O. Box 7, Dubai, UAE.

4.    At all times relevant hereto, Defendant TA YI was and still is a business entity duly organized and existing under the laws of a foreign country with the address 33 Chang Mei Rd. See 2, Ho Mei Twon, Chang Hua, TAIWAN.

5.    On or about January 14, 2008, Plaintiff, in the capacity as owner of the M/V NASSAU PRIDE, entered into a maritime contract of charter party with Defendant RICH WEALTH, as charterer, for the carriage of bauxite from Porbandar, India to Shandong Port or Linyungang. A copy of the charter party and fixture recap is annexed as Exhibit A.

6.    Ta Yi was the seller of the subject cargo and pursuant to the attached Agreement between Plaintiff Trojan and Ta Yi, Ta Yi has agreed and guaranteed the full, due and complete performance of the subject charter party. A copy of the agreement is annexed as Ex. B.

7.    Plaintiff duly tendered the vessel into service under the charter, the cargo was loaded, the bills of lading released and the vessel is now en route to the discharge port.

8.    Under the terms of the contract, the Defendant was obliged to pay the full freight within three (3) banking days after the release of the bills of lading.

9.      The bills of lading were executed and released on February 12, 2008.

10.     The total amount of freight, together with deadfreight for the cargo not loaded, amounts to $1,348,060.94, and should have been remitted on or before February 15, 2008.

11.     The failure to timely pay the freight constitutes a breach of the charter party.

12.     In addition, demurrage at the load port of $102,256.95 has accrued but not been paid.

13.     Despite due demand, RICH WEALTH has refused and/or otherwise failed to pay the amounts due and accrued under the charter party, and a balance of $1,450,317.89 remains open.

14.     The charter party provides for the application of English law and disputes between the parties shall be referred to arbitration in London, and Trojan specifically reserves its right to arbitrate the substantive matters at issue.

15.     This action is brought to obtain jurisdiction over RICH WEALTH and Ta Yi and to obtain security in favor of Plaintiff TROJAN in respect to its claims against RICH WEALTH and Ta Yi and in aid of London proceedings.

16.     Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

17.     This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

18.     Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $175,000 and interest on its damages are

estimated to be $235,676.65 (calculated at the rate of 6.5% for a period of 2.5 years, the estimated time for completion of the proceedings in London).

### Request for Rule B Relief

19.    Upon information and belief, and after investigation, the Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of the Defendants (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Amended Process of Attachment issued herein.

20.    The total amount to be attached pursuant to the calculations set forth above is $1,860,994.54

WHEREFORE, Plaintiff TROJAN MARITIME INC. prays:

a.    That process in due form of law according to the practice of this Court may issue against the Defendants citing it to appear and answer the foregoing;

b.    That if the Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including $1,860,994.54 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-

charter hire, of, belonging to, due or being transferred from or for the benefit of the Defendants (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.      That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       March 4, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
TROJAN MARITIME INC.

By

Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BC 1651)
80 Pine Street
New York, NY 10005
(212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York  )

       PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

      1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

      3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                            Peter J. Gutowski

Sworn to before me this
4th day of March 2008

Notary Public
HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# EXHIBIT A

| 1.Shipbroker | |
|---|---|

| **FAIRWAY SHIP CHARTERING**<br>**DUBAI, U.A.E.**<br>**TEL:+971-4-3934997 ;**<br>**FAX: +971-4-3938826**<br>**E-mail: chartering@fairwaychartdxb.com** | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER(AS REVISED 1922, 1976 AND 1994)<br>(To be used for trades for which no specially approved form is·in force)<br>CODE NAME:"GENCON"                                     Part I |
|---|---|

| | 2. Place and date<br>Tianjin ,14th jan,2008 |
|---|---|
| 3. Owners/Place of business (Cl.1) | 4.Charterers/Place of business (Cl.1)<br>RICH  WEALTH SHIPPING SERVICE CO.,LIMITED. |
| 5. Vessel's name (Cl.1)<br>MV.NASSAU PRIDE | 6. GT/NT (Cl.1)<br>GRT/ NRT :  21,193.00 / 13,073.00 |
| 7. DWT all told on summer load line in metric tons(abt) (Cl.1)<br>35.175MT DWT | 8. Present position (Cl.1) |
| 9. Expected ready to load (abt.) (Cl.1)<br>LAYCAN 19TH -30TH JAN,2008 | |
| 10. Loading port or place (Cl.1)<br>1~2 SB/A 1SP PORBANDAR, INDIA | 11. Discharging port or place (Cl.1)<br>1SB 1SP NORTH CHINA |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl.1)<br>MIN 33,000MT -MAXIMUM 33500MT BAUXITE IN BULK | |
| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl.1)<br>AS PER RIDER CLAUSE NO. 24 | 14. Freight payment (state currency and method of payment;also beneficiary<br>and bank account) (Cl.4)<br>AS PER RIDER CLAUSE NO. 25 |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5)<br>AS AGREED | 16. Laytime (if separate laytime for load. And disch. Is agreed, fill in a) and b). If<br>total laytime for  load. and disch. ,fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6)<br>SHIPPERS/SUPPLIERS: | a) Laytime for loading<br>AS  AGREED |
| 18. Agents (loading) (Cl. 6)<br>AS PER RIDER CL. 33 | b) Laytime for discharging<br>AS  AGREED |
| 19. Agents (discharging) (Cl. 6)<br>AS PER RIDER CL. 33 | c) Total laytime for loading and discharging<br>AS PER CL 22 & 23 |
| 20. Demurrage rate and manner payable (loading and discharging)  (Cl.7)<br>USD 25,000/DHD PDPR BOTH ENDS | 21. Cancelling date (Cl.10)<br>AS PER CL 9 |
| | 22. General Average to be adjusted at (Cl. 12)<br>AS PER RIDER CL NO 37 |
| 23. Freight Tax (state if for the Owners' account) (Cl. 13(c))<br>AS PER RIDER CL 38 | 24. Brokerage commission and to whom payable (Cl. 15) |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19(c) agreed<br>also state Place of Arbitration) (if not filled in 19 (a) shall apply)( Cl. 19)<br>LONDON, ENGLISH LAW . | **TTL 2.50% COMM IAC :-**<br>1.25% PAYABLE TO CHTR IN SAME DAY WITH FREIGHT PAYMENT<br>ON GROSS FREIGHT/DEAD FREIGHT/DEMURRAGE + PLUS;<br>A COMMISSION OF 1.25 % TO  FAIRWAY SHIP-DUBAI PAYABLE BY<br>OWNER. ON GROSS FREIGHT OR DEADFREIGHT AND DEMURRAGE. |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19)<br>50,000.00USD | 26. Additional clauses covering special provisions, if agreed<br>Rider clauses 20 -- 54(both inclusive) and to·be fully<br>incorporated top this c/party are deemed and formed |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event
of a conflict of conditions, the provisions of Part I shall prevail over those of part II to the extent of such conflict.

| Signature (Owners) on bealf as carrkrs/sub charterers | Signature (Charterers) |
|---|---|
| | |

**PART II**

**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 6 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that;
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. **Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. **Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight SEE RIDERS**
(a) ~~The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.~~
~~(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.~~
~~Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~
~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.~~
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. **Loading/Discharging SEE RIDERS**
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power – pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party – shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. **Laytime SEE RIDERS**
~~(a) Separate laytime for loading and discharging~~
~~The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used in which event time used shall count.~~
~~The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~(b) Total laytime for loading and discharging~~
~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of

readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. **Demurrage SEE RIDERS**
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
~~In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

8. **Lien Clause**
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. **Bills of Lading SEE RIDERS**
Bills of Lading shall be presented and signed by the Master as per the ~~"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.~~

11. **Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. **General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply:" In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposits as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

13. **Taxes and Dues Clause SEE RIDERS**
(a) On Vessel – The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.
(b) On cargo – The Charterers shall pay all dues, charges and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) On freight – Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

PART II
"Gencon" Charter (As Revised 1922, 1976 and 19...)
MV "AFRICAN LARK" CP DATED 24TH AUG 20...

**14. Agency** SEE RIDERS
~~In every case the Owners shall appoint their own Agent both at the port of~~ 207
~~loading and the port of discharge.~~ 208
209

**15. Brokerage** 210
~~A brokerage commission at the rate stated in Box 21 on the freight, dead-freight~~ 211
~~and demurrage earned is due to the party mentioned in Box 24.~~ 212
~~In case of non-execution 1/3 of the brokerage on the estimated amount of~~ 213
~~freight to be paid by the party responsible for such non-execution to the~~ 214
~~Brokers as indemnity for the latter's expenses and work. In case of more~~ 215
~~voyages the amount of indemnity to be agreed.~~ 216

**16. General Strike Clause** 217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219
at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling this Charter 224
Party. If part of cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is strike or lock-out affecting or preventing the actual discharging of 228
the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247
(1) For the purpose of this Clause, the words: 248
  (a) The "Owners" shall include the shipowners, bareboat charterers, 249
  disponent owners, managers or other operators who are charged with the 250
  management of the Vessel, and the Master; and 251
  (b) "War Risks" shall include any war (whether actual or threatened), act of 252
  war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
  operations, the laying of mines (whether actual or reported), acts of piracy, 254
  acts of terrorists, acts of hostility or malicious damage, blockades 255
  (whether imposed against all Vessels or imposed selectively against 256
  Vessels of certain flags or ownership, or against certain cargoes or crews 257
  or otherwise howsoever), by any person, body, terrorist or political group, 258
  or the Government of any state whatsoever, which, in the reasonable 259
  judgement of the Master and/or the Owners, may be dangerous or are 260
  likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
  persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or likely to expose, 265
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks; provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the ports or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274
first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such requirements. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to be, 287
exposed to War Risks. If it should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296
carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage which the extra distance represents to 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight. 301
(4) If at any stage of the voyage after the loading of the cargo commences, it 302
appears that, in the reasonable judgement of the Master and/or the 303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel 304
may be, or are likely to be, exposed to War Risks on any part of the route 305
(including any canal or waterway) which is normally and customarily used 306
in a voyage of the nature contracted for, and there is another longer route 307
to the discharging port, the Owners shall give notice to the Charterers that 308
this route will be taken. In this event the Owners shall be entitled, if the total 309
extra distance exceeds 100 miles, to additional freight which shall be the 310
same percentage of the freight contracted for as the percentage which the 311
extra distance represents to the distance of the normal and customary 312
route. 313

(5) The Vessel shall have liberty:- 314
  (a) to comply with all orders, directions, recommendations or advice as to 315
  departure, arrival, routes, sailing in convoy, ports of call, stoppages, 316
  destinations, discharge of cargo, delivery or in any way whatsoever which 317
  are given by the Government of the Nation under whose flag the Vessel 318
  sails, or other Government to whose laws the Owners are subject, or any 319
  other Government which so requires, or any body or group acting with the 320
  power to compel compliance with their orders or directions; 321
  (b) to comply with the orders, directions or recommendations of any war 322
  risks underwriters who have the authority to give the same under the terms 323
  of the war risks insurance; 324
  (c) to comply with the terms of any resolution of the Security Council of the 325
  United Nations, any directives of the European Community, the effective 326
  orders of any other Supranational body which has the right to issue and 327
  give the same, and with national laws aimed at enforcing the same to which 328
  the Owners are subject, and to obey the orders and directions of those who 329
  are charged with their enforcement; 330
  (d) to discharge at any other port any cargo or part thereof which may 331
  render the Vessel liable to confiscation as a contraband carrier; 332
  (e) to call at any other port to change the crew or any part thereof or other 333
  persons on board the Vessel when there is reason to believe that they may 334
  be subject to internment, imprisonment or other sanctions. 335
  (f) where cargo has not been loaded or has been discharged by the 336
  Owners under any provisions of this Clause, to load other cargo for the 337
  Owner's own benefit and carry it to any other port or ports whatsoever, 338
  whether backwards or forwards or in a contrary direction to the ordinary or 339
  customary route. 340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this 341
  Clause anything is done or not done, such shall not be deemed to be a 342
  deviation, but shall be considered as due fulfilment of the Contract of 343
  Carriage. 344

**18. General Ice Clause** 345
**Port of loading** 346
(a) In the event of the loading port being inaccessible by reason of ice when the 347
Vessel is ready to proceed from her last port or at any time during the voyage or 348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the 349
Master for fear of being frozen in is at liberty to leave without cargo, and this 350
Charter Party shall be null and void. 351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it 352
advisable to leave, he has the liberty to do so with what cargo he has on board and 353
to proceed to any other port or ports with option of completing cargo for the 354
Owner's benefit for any port or ports including port of discharge. Any part 355
cargo thus loaded under this Charter Party to be forwarded to destination at the 356
Vessel's expense but against payment of freight, provided that no extra 357
expenses be thereby caused to the Charterers, freight being paid on quantity 358
delivered (in proportion if lumpsum), all other conditions as per this Charter 359
Party. 360
(c) In case of more than one loading port, and if one or more of the ports are 361
closed by ice, the Master or the Owners to be at liberty either to load the part 362
cargo at the open port and fill up elsewhere for their own account as under 363
section (b) or to declare the Charter Party null and void unless the Charterers 364
agree to load full cargo at the open port. 365

**Port of discharge** 366
~~(a) Should ice prevent the Vessel from reaching port of discharge the~~ 367
~~Charterers shall have the option of keeping the Vessel waiting until the re-~~ 368
~~opening of navigation and paying demurrage or of ordering the Vessel to a safe~~ 369
~~and immediately accessible port where she can safely discharge without risk of~~ 370
~~detention by ice. Such orders to be given within 48 hours after the Master or the~~ 371
~~Owners have given notice to the Charterers of the impossibility of reaching port~~ 372
~~of discharge.~~ 373
~~(b) If during discharging the Master for fear of the Vessel being frozen in deems~~ 374
~~it advisable to leave, he has liberty to do so with what cargo he has on board and~~ 375
~~to proceed to the nearest accessible port where she can safely discharge.~~ 376
~~(c) On delivery of the cargo at such port, all condition of the Bill of Lading shall~~ 377
~~apply and the Vessel shall receive the same freight as of she had discharged at~~ 378
~~the original port of destination, except that if the distance of the substituted port~~ 379
~~exceeds 100 nautical miles, the freight on the cargo delivered at the substituted~~ 380
~~port to be increased in proportion.~~ 381

**19. Law and Arbitration** 382
  *(a) This Charter Party shall be governed by and construed in accordance with 383
  English law and any dispute arising out of this Charter Party shall be referred to 384
  arbitration in London in accordance with the arbitration Acts 1950 and 1979 or 385
  any statutory modification or re-enactment thereof for the time being in force. 386
  Unless the parties agree upon a sole arbitrator, one arbitrator shall be 387
  appointed by each party and the arbitrators so appointed shall appoint a third 388
  arbitrator, the decision of the three-man tribunal thus constituted or any two of 389
  them, shall be final. On the receipt by one party of the nomination in writing of 390
  the other party's arbitrator, that party shall appoint their arbitrator within fourteen 391
  days, failing which the decision of the single arbitrator appointed shall be final. 392
  For disputes where the total amount claimed by either party does not exceed 393
  the amount stated in Box 25** the arbitration shall be conducted in accordance 394
  with the Small Claims Procedure of the London Maritime Arbitrators 395
  Association. 396
  (b) This Charter Party shall be governed by and construed in accordance with 397
  Title II of the United States Code and the Maritime Law of the United States and 398
  should any dispute arise out of this Charter Party, the matter in dispute shall be 399
  referred to three persons at New York, one to be appointed by each of the 400
  parties hereto, and the third by the two so chosen; their decision or that of any 401
  two of them shall be final, and for purpose of enforcing any award, this 402
  agreement may be made a rule of the Court. The proceedings shall be 403
  conducted in accordance with the rules of the Society of Maritime Arbitrators, 404
  Inc.~~*~~ 405
  ~~For disputes where the total amount claimed by either party does not exceed~~ 406
  ~~the amount stated in Box 25** the arbitration shall be conducted in accordance~~ 407
  ~~with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,~~ 408
  ~~Inc.~~ 409
  * (c) Any dispute arising out of this Charter Party shall be referred to arbitration at 410
  the place indicated in Box 25, subject to the procedures applicable there. The 411
  laws of the place indicated in Box 25 shall govern this Charter Party. 412
  (d) If Box 25 in Part II is not filled in, sub-clause (a) of this Clause shall apply. 413
  *(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 414
  ** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but 415
  the other provisions of this Clause shall have full force and remain in effect. 416

**RIDER CLAUSES TO M.V ' NASSAU PARADISE OR SISTER N-PRIDE ' DD 14th  jan  2008**

CLAUSE 20:
VESSEL'S DESCRIPTION:
Owners hereby nominated the below ship

**MV.NASSAU PARADISE OR SISTER N-PRIDE**

**Bahamas Flag 1984 (NASSAU PRIDE 1985)**
**35,175 mt on 10.673 ssw   TPI 112 mt**
**Loa:  177.40 m          Bm: 29.5 m              5 Ho   5 Ha**
**Const. 400 mt excluding fw**
**Total grain capacity: 1,519,802  cu.  ft.**
**Gear: 4 x 15 mts Cranes plus 2 x 15 mts derr. Single pull 5 mts UP**
**Hatch openings: No. 1 (,C 13.015 x 10.3m (,C No. 2 to 5 (,C 19.55 x 15.1 m**
**McGregor Hatchcovers**
**Abt 13 on abt 28L / 26B mt 180  cst (bunker specification RME25)  + 2.5 mt MDO**
**(bunker specification DMB)**
**In port about 3 to 5 mt MDO depending on usage of cargo gear**

**In good weather conditions with no adverse current and no negative influence of**
**swell upto and including BF4**
**The vessel uses Marine Diesel Oil when manoeuvring in or out of narrow waters.**
**ALL DETAILS  ABOUT WOG ..**

**Owners to declare performing vsl 24 hours after clean fixture all terms**

ITINERARY:

VSL ETC UMM QASAR JAN 22 AGW.

CLAUSE 21:
LOADING  PORT:
1 sp 1 -2 sa/b  Porbandar India

DISCHARTING PORT:
1 sp 1 sb North China

CLAUSE 22:LOAD RATE

Load 7000m/t PER WEATHER WORKING DAY OF 24 CONSECUTIVE WORKING HOURS, SUNDAYS,
HOILIDAYS INCLUDED .

CLAUSE 23:
DISCHARGE RATE:
8000METRIC TONNES PER WEATHER WORKING DAY OF 24 CONSECUTIVE WORKING HOURS,
SATURDAY,SUNDAYS, HOILIDAYS INCLUDED.

CLAUSE 24:
FREIGHT RATE: USD 40.75 PMT FIOT

CLAUSE 25:
FREIGHT PAYMENT TERMS:
100% freight less chtrs commission to be paid within 3 banking days after completion of loading and
signing/releasing of original bills of lading marked "Freight Payable as per Charter Party" but always before
breaking bulk. IF FREIGHT PREPAID TO BE REQUESTED, ORIGINAL B/L TO BE RELEASED ONLY

AGAINST 100% FREIGHT PAYMENT BEING RCVD BY OWNERS

CLAUSE 26:
SETTLEMENT OF DEMURRAGE /DISPATCH:
Demurrage /Dispatch at load port and at disch port, if any within 5 days after completion of discharge and upon presentation of fax/e-mail copies of sof/nor signed by master/agents and Owners' invoice along with Laytime Calculation etc.

CLAUSE 27:
Master/Owner to give /4/3/2/1 days notice of arrive to buyer/shipper/receiver/charterer at both ends.

CLAUSE 28:

delete

CLAUSE 29:
At load port, NOR shall be tendered with clean and dry holds/hatches open and ready in all the respects to load.

RIDER CLAUSES TO M.V ' NASSAU PARADISE OR SISTER N-PRIDE ' DD 14th jan 2008

CLAUSE 30: LAYTIME CALCULATION:
Laytime is reversible.

In case loading/discharging can not commence or to be interrupted due to reasons of responsibility of vessel; such time lost shall not count as laytime.

CLAUSE 31:
DISCHARGING/RELEASE OF CARGO:
charterers & rcvr will provide owner prior to discharge with an loi in owners P & I club wording with charterers & rcvr official stamp and authorized signature in case original b/l does not reach the discharge port in time for the only discharge operation . In any event, Cargo to be released against original bs/l or reciever/Charterers  to provide owners with first class bank guarantee.

CLAUSE 32:
delete

CLAUSE 33:
AGENTS:
CHTR'S agent  at bents and owners paying the customary agency fees subject pda & service approved by the owner.  on agents proforma to be paid by the Owner.

CLAUSE 34:.
Delete

CLAUSE 35:
delete

CLAUSE 36:
No extra insurance due to vessel's age/flag.

CLAUSE 37:
GA and Arbitration, if any, in LONDON and English Law to be applied.

CLAUSE 38:
Any taxes/ due on vessel/freight to be for Owners account.

CLAUSE 39:
Any taxes / dues on cargo to be for charterers account.

CLAUSE 40:
delete

CLAUSE 41:
Owners guarantee vessel will produce all valid international docs/certificates of the vessel ensuring the tenure of the voyage as per port regulations.

CLAUSE 42:
"Chrtrs are to appoint an independant draft surveyor at load/discharge port to determine final cargo weights loaded and discharged respectively,  the weight determined by the draft survey at the load port shall for all intents and purposes be the total shipped weight to be reflected on the Bills of Lading "

CLAUSE 43:
Owners guarantee that vessel fully classed Lloyd's 100a1 or Equivalent with full member of IACS and vessel has no Outstanding recommendations or restrictions or any other Requirements of any nature in respect of flag state, port State control or classification inspections.

**RIDER CLAUSES TO M.V ' NASSAU PARADISE OR SISTER N-PRIDE ' DD 14th  Jan  2008**

CLAUSE 44:
Owners guarantee that vessel is fully covered for P&I and H&M Covers and will remain so for the duration of this voyage, specifically covered for oil pollution risks and Wreck removal risks, and will be maintained so for the Entire duration of this c/p.

CLAUSE 45:

Owners guarantee that all vessel's international certificates are valid and fully up to date and Owners accept to make same available to charterers for inspection, if requested. Vessel ISM Certified. BIMCO ISM clause to apply.

CLAUSE 46:
delete.

CLAUSE 47:
delete.

CLAUSE 48:
BIMCO ISM/ISPS CLS TO APPLY.

CLAUSE 49:
delete

CLAUSE 50:
delete

CLAUSE 51:
Owners guarantee that vessel shall not be sold and/or renamed and/or scrapped during the currency of this c/p and also owners shall not change ownership and/or flag during currency of this c/p.

CLAUSE 52:
delete
CLAUSE 53:
delete

CLAUSE 54 :
Clause Paramount
The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 (the Hague Rules) as amended by the Protocol signed at Brussels on 23 February 1968 (the Hague-Visby Rules) and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 (the SDR Protocol 1979) shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.
The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.


for the Charterers                                    for the Owners



ends++++++++

Subj:    **NASSAU PRIDE / RICH WEALTH - FINAL RECAP.**
Date:    1/17/2008 12:16:35 P.M. Eastern Standard Time
From:    chartering@fairwaychartdxb.com
To:    SeaBridgeNY@aol.com

# FROM : FAIRWAY SHIP CHARTERING LLC, DUBAI
## (A MEMBER OF THE RAIS HASSAN SAADI GROUP)
=================================================

**TO: SEA BRIDGE NY (OWNERS)**

**ATTN: MR. NICK**

**GOOD EVNG FM DUBAI !**

**MANY THANKS FOR THE CONCLUSION OF THE C/P TERMS.**

**HERE-BELOW PLS FIND THE FINAL FXTR RECAP:**

**NASSAU PRIDE / RICH WEALTH**
======================

**PERFORMING VESSEL:-**

**m/v "NASSAU PRIDE" – Bahamas Flag 1985**
**35,175 mt on 10.673 ssw or 35' ¼" TPI 112 mt**
**Loa: 177.40 m    Bm: 29.5 m    5 Ho  5 Ha**
**Const. 400 mt excluding fw**
**Total grain capacity: 1,519,802 cu. ft.**
**Gear: 4 x 15 mts Cranes plus 2 x 15 mts derr. Single pull 5 mts UP**
**Hatch openings: No. 1 – 13.015 x 10.3m – No. 2 to 5 – 19.55 x 15.1 m**
**McGregor Hatchcovers**
**Abt 13 on abt 28L / 26B mt 180  cst (bunker specification RME25)  + 2.5 mt MDO**
**(bunker specification DMB)**
**In port about 3 to 5 mt MDO depending on usage of cargo gear**
**In good weather conditions with no adverse current and no negative influence of swell**
**upto and including BF4and/or Douglas Sea State3**
**The vessel uses Marine Diesel Oil when manoeuvring in or out of narrow waters.**
**ALL DETAILS "ABOUT WOG"**

**FOR:**

**- A/C: RICH WEALTH SHIPPING SERVICE CO., LTD. – PR CHINA / HONG KONG.**

**- CARGO: MIN 33,000 - MAX 33,500 BAUXITE IN BULK BSS CHRTS TOPPING OFF AT
ANCHORAGE (FYG, BSS 9.8 M DRAFT AT BERT ALONE MAX CARGO 29,500 MTS LIFT)**

**- L/PORT: 1~2 SB/A 1SP PORBANDAR, INDIA**

**- DRAFT : IN LOADING PORT DRAFT IS 9.8M AND WHEN LOADING VSL BEYOND 9.8M
WILL SHIFT TO ANCHORAGE TO LOAD THE BALANCE UP TO AGREED QUANTITY.**

**- D/PORT: 1SB 1SP NORTH CHINA**

- LAYCAN: 19/30 JAN 2008

- LOAD/DISCH RATE: 7,000MT PWWD SHINC / 8,000MT PWWD SHINC BOTH ENDS

- DEMURRAGE/DESPATCH: USD25,000 HALF DESPATCH. DEM/DESP IF ANY, WITHIN 5 (FIVE) DAYS AFTER COMPLETION OF DISCHARGING AGAINST RELEVANT SUPPORTING DOCS BENDS.

- FREIGHT: USD 40.75 PMT ON F.I.O.  BASIS 1/1

- FREIGHT PAYMENT:  100% FREIGHT LESS COMM TO BE PAID TO OWNERS' NOMINATED BANK A/C WITHIN THREE (3) BANKING DAYS AFTER COMPLETION OF LOADING, AFTER S/R B/L BUT ALWAYS BEFORE BREAKING BULK, BS/L MARKED "FREIGHT PAYABLE AS PER C/P".

IF FREIGHT PREPAID TO BE REQUESTED, ORIGINAL B/L TO BE RELEASED ONLY AGAINST 100% FREIGHT PAYMENT BEING RCVD BY OWNERS.

-  OAP, IF ANY, TO BE FOR CHTRS'S ACCOUNT .

-  LIGHTERAGE/LIGHTENING, IF ANY, TO BE FOR SHPRS/CHTRS/RCVRS ACCT AT BENDS.

- VSL'S GEARS BROKEN DOWN, IF ANY, TIME TO COUNT ON A PRO-RATA BASIS. OWNERS ALWAYS TO HAVE REASONABLE OPPORTUNITY TO REPAIR ANY BREAKDOWNS.

- CHRS AGENT BOTH ENDS.

- BIMCO ISM/ISPS CLS TO APPLY.

- ANY TAXES/DUES ON CARGO TO BE FOR CHARTERERS ACCOUNT; ANY TAXES/DUES ON VESSEL & OCEAN FREIGHT TO BE FOR OWNERS'S ACCOUNT

- NOR TO BE TENDERED AS PER GENCON C/P 1994

- CARGO TO BE RELEASED AGAINST ORIGINAL BS/L.

- OWNERS/MASTER TO GIVE AGENTS VESSEL'S ETA NOTICE 4/3/2/1 DAY(S) BEFORE VESSELS ARRIVAL AT L/D PORT

- G/A, ARBITRATION IF ANY TO BE SETTLED IN LONDON WITH ENGLISH LAW TO APPLY.

- OTHER TERMS/CONDITIONS TO BE AGREED BSS CHTR'S PROFORMA BSS GENCON C/P 1994: AS BELOW.

- TTL 2.50% COMM IAC ( 1.25PCT ADCOM + 1.25PCT FAIRWAY SHIP CHRTRG-DUBAI)

- ALL SUBJECTS TO BE LIFTED BY CHTRS/SHPRS/RCVRS : ARE IN ORDER.

THE PROFORMA C/P TO BE AMENDED LOGICALLY AS PER AGREED MAIN TERMS ABOVE & AS FOLLOWS :

PART I:

-cls 6.  int'l grt 21,193.00 / nrt 13,073.00

**PART II:**

-cls 1:  reinstate in its entirety

-cls 2:  reinstate in its entirety

-cls 5: a thru c :  reinstate in its entirety (including in 72 delete "Owners" reinstate "charterers")

-cls 6: in 120: reinstate

-cls 15: Delete.

-cls 17: reinstate in its entirety

**RIDER :**

-20: NASSAU PARADISE  1984
NASSAU PRIDE 1985

Owners to declare performing vsl 24 hours after clean fixture all terms.

-cls 21
loading port: 1 sp 1 -2 sa/b Porbandar India (as per mt)

Disch port
1 sp 1 sb North China

-cls 24: FREIGHT RATE USD 40.75 PMT FIOT

-cls 30: Laytime is reversible.
In case loading/discharging can not commence or to be interrupted due to reasons of responsibility of vessel; such time lost shall not count as laytime.

-cls 31: charterers & rcvr will provide owner prior to discharge with an loi in owners P & I club wording with charterers & rcvr official stamp and authorized signature in case original b/l does not reach the discharge port in time for the only discharge operation . In any event, Cargo to be released against original bs/l or reciever/Charterers  to provide owners with first class bank guarantee .

-cls 41: insert "international" before "docs/certificates"

-cls 45: insert "international" before "certificates"

-cls 46: delete (not necessay - cargo is bulk)

-cls 47: delete (not necessary)

-cls 48: insert Bimco ISPS cls (as per mt)

**END FINAL RECAP.**


**KINDLY ADVICE IF THE ABOVE IS IN ORDER OR ANY CORRECTION REQD.**

**PLSD TO HEAR,**

**THANKS/ BRGDS**

**Capt. Sharad Tripathi, FICS.**
**CHARTERED SHIPBROKER**

**FAIRWAY SHIP CHARTERING L.L.C.**
**As brokers only.   CONSIDER IT DONE**

### THE FAIR WAY !!

Mobile☎: +971-50-6402932
Tel:+971-4-3934997
Fax:+971-4-3938826
E-mail: chartering@fairwaychartdxb.com
        stripathi@fairwaychartdxb.com

Gmail: fairwaydubai@gmail.com
MSN☎: sharadstripathi@hotmail.com
YAHOO: sstcharting@yahoo.co.in

# EXHIBIT B

## AGREEMENT REGARDING COMPLETION OF
## PERFORMANCE OF CHARTER

WHEREAS TROJAN MARITIME INC., as Owner of the M/V NASSAU PRIDE ("Trojan"), entered into a contract of charter party with RICH WEALTH SHIPPING SERVICES CO., LTD. ("Rich Wealth") dated January 14, 2008 for carriage of bauxite from India to China (the "Charter Party"); and

WHEREAS there is a balance of freight, together with demurrage and other charges, which remains due and outstanding under the Charter Party; and

WHEREAS the vessel is at or off the discharge port; and

WHEREAS the receiver of the cargo CHIPING XINFA HUAYU ALUMINA ("Chiping") has opened a certain Letter of Credit for the benefit of the Seller, TA YI INTERNATIONAL CO., LTD, a/k/a TA YI INTERNATIONAL CO., LTD, (SAMOA) (hereinafter "Ta Yi") bearing L/C No: 385020800004 in the total amount of $2,330,000 in connection with the payment for the subject cargo (hereinafter the "L/C"), and

WHEREAS the Seller Ta Yi is indebted to the Charterer Rich Wealth in respect to this transaction and, with the consent of Rich Wealth, wishes to accommodate the completion of the transaction and the delivery of the cargo by, *inter alia*, arranging for a portion of the sale proceeds owed to it by Chiping and to be paid under the above referenced L/C to be restrained by and/or otherwise remitted to Trojan;

NOW, THEREFORE, THE PARTIES HERETO agree as follows:

1.    To facilitate the payment of the balance of freight and other sums due to Trojan, the Seller Ta Yi hereby agrees and consents to a restraint of the transfer of funds to be paid under the above-referenced L/C from the Chiping under the Supplemental Rule B Attachment Order

NYDOCS1/289905.1                        - 1 -

issued in pending New York action by Trojan against Rich Wealth bearing Civil Action NO 08
Civ. 1863 and a release of same to Trojan in partial satisfaction of the outstanding freight and
other sums due under the subject Charter Party;

2.    The Seller Ta Yi hereby agrees and guarantees the full, due and complete
performance of the subject Charter Party;

3.    In the event the L/C proceeds being paid from the receiver Chiping to Ta Yi are
not restrained in New York pursuant to the Rule B action attachment referred to in paragraph 1
above and released to Trojan, Ti Yi agrees that it will pay to Trojan the outstanding balance of
freight and demurrage from the proceeds of the L/C immediately upon Ti Yi's receipt of same;

4.    Trojan will instruct the vessel to enter the port and discharge the cargo to Chiping;
and

5.    This Agreement shall be construed under the laws of New York or United States
of America and the parties consent to jurisdiction before the Southern District of New York for
any claims arising from or relating to this agreement.

Dated: March 4, 2008

                                        TROJAN MARITIME INC.

                                   By: _____

Dated: March 4, 2008

                                        TA YI INTERNATIONAL CO., LTD. a/k/a TA
                                        YI INTERNATIONAL CO., LTD. (SAMOA)

                                   By: _____
                                        Authorised Signature

NYDOCS1/299205.1              -2-